## MADDOX *v.* UNITED STATES.

1. Under the statutory provisions, treasury regulations, and executive orders concerning the purchase of the products of insurrectionary States, a purchasing agent, acting on behalf of the United States, had no authority to negotiate with any one in relation to the purchase of such products, unless at the time of the negotiation the party either owned or controlled them.
2. Private citizens were prohibited from trading at all in the insurrectionary districts. The object of the law, and the regulations made to carry it into effect, was to encourage the insurgents themselves to bring their products to loyal people.
3. *United States* v. *Lane* (8th Wallace, 185), affirmed, on the two points above quoted.

APPEAL from the Court of Claims; the case being thus:

H. A. Risley, treasury agent at Norfolk for the purchase of the products of insurrectionary States, in November, 1864, contracted in writing to purchase from Maddox and certain persons associated with him, loyal citizens of the United States, a large quantity of tobacco, rosin, and turpentine, situated in the States of Virginia and North Carolina, to be delivered in Norfolk or New York, and sold at certain points mentioned, under the same conditions as other sales of like public property.

With the contract Risley delivered to Maddox and his associates a request for safe-conduct and means of transportation.

This request was presented to the President of the United States, who indorsed on it that the property to be transported under the contract should be free from seizure or detention, and that the military and naval authorities be requested to furnish the necessary facilities for getting the products within our lines. These products, at the time the contract was made, and the military safe-conduct delivered, were not owned or controlled by Maddox and the others, but they expected to procure them in or about the city of Richmond, in the State of Virginia. In the months of January and February, 1865, they succeeded, in part perform-

ance of their contract, in purchasing a large number of boxes of tobacco—less, however, than they had agreed to do—which were subsequently either burned by our military forces, appropriated by them to the use of the United States, or destroyed in the fires in Richmond at the time it was captured, in April, 1865.

Hereupon Maddox and his associates filed a petition in the Court of Claims for an alleged breach of contract, and praying judgment for $735,644, with interest.

The United States demurred and the court sustained the demurrer. To reverse that decision this appeal was prosecuted.

*Mr. C. H. Hill, Assistant Attorney-General, in support of the ruling below,* argued that the case was similar to the *United States* v. *Lane,*\* in which it was held, after a review of the statutory provisions and the treasury regulations concerning the purchase of products of insurrectionary States, that a purchasing agent, acting in behalf of the United States, had no authority to negotiate with any one in relation to the purchase of such products, unless at the time of the negotiation the party either owned or controlled them; in other words, that they were not designed to protect a speculation; that independently of this the petition did not allege, and the facts did not show, that the contractors were ready and willing, or were even in a condition to perform fully the contract on their part; that is to say, to deliver the *whole* of the products contracted for.

And, finally, that if the claim had any foundation at all, it was the damage sustained in consequence of the action of the military authorities; a claim not within the jurisdiction of the Court of Claims.†

*Messrs. B. R. Curtis and James Hughes, contra, for the appellants,* argued—

1st. That the *United States* v. *Lane* did not rule this case,

---

\* 8 Wallace, 185.     † See act of July 4, 1864, 13 Stat. at Large, 381.

because: 1st. The facts were different in this case, Lane in his case having had far greater facilities, and he having been allowed to carry an outward cargo. The point resolved in the case was that carrying an outgoing cargo was without authority of law or regulations pursuant to law.

2d. That all comments of the court made in the Lane case, which do not apply to this case, were *obiter dicta* and subject to be reviewed and reconsidered in this case.

Mr. Justice DAVIS delivered the opinion of the court.

The United States are called on to make good the loss caused by the alleged wrongful conduct of their military officers, and the inquiry is, can they be required to do it in this suit?

The main question involved in this inquiry is important, on account of the large pecuniary interests at stake, but is freed from all difficulty since the decision of this court in *United States* v. *Lane.* The cases are not distinguishable. In both the right to recover was based on contracts made by the same treasury agent with private citizens, for the purchase from them of products which were within the lines held by the insurrectionary forces. In each case the agent requested safe-conduct for the parties and their necessary means of transportation through the Federal military lines. In neither case were the products owned, or even under the control, of those who had contracted to sell them, but in each case the parties expected, after they had secured their contracts, to go within the rebel lines and obtain the products which they had agreed to deliver. It is true, in Lane's case there were greater facilities for the execution of the contract and better security for its performance, for Lane was allowed to take out a cargo of goods to exchange for the cotton to be purchased, and this cargo was in charge of a sub-agent, under instructions not to deliver it until treble its value in cotton should be put on board the vessel.

But these proceedings were intended only as a means to an end. The performance of the contract was the principal thing to be effected, and the license to take out a cargo of

goods,. under certain restrictions, was, of necessity, given for the mere purpose of securing a desired result. If Maddox did not enjoy the advantage of a similar license, he had the use of other means not accorded to Lane, which were expected to accomplish a similar result. It is easy to see that he could have few things better adapted to fortify him against failure than the certificate of the President that the products moved by him should be free from seizure, accompanied by an order on the commandants of military districts and naval stations to aid him in his enterprise. Whether the facilities extended to Lane were more ample than those which Maddox possessed is an immaterial subject of inquiry. It is enough to say that the difference in the character of these facilities constitutes the only distinction between the cases, and that this difference is incidental merely—not necessary to the chief purpose in each, and in no wise affecting the validity of the contracts. If this be so, there is an end of this litigation, for the entire subject embraced in this contract was before us in Lane's case and passed on. Lane, in his petition to the Court of Claims, stated that he made a contract with Risley, the treasury agent, at Norfolk, similar to the one in controversy, and for the purpose of executing it purchased a steamer at great cost, with which he proceeded to. Chowan River, North Carolina, and loaded with cotton procured there, and that on the return voyage the steamer and cargo were forcibly seized by the naval authorities, and the cotton appropriated to the use of the United States. For this alleged wrongful seizure of the vessel and appropriation of the cotton he claimed that his contract was violated, and that he was entitled to remuneration. Nothing is said in the petition about an outward cargo, but the Court of Claims found, as one of the facts of the case, that Lane had a license to take out in his steamer certain articles, a schedule of which was attached to the safe-conduct given by the military commander. Manifestly, from this statement of the case, the contract was the foundation of the whole proceeding, and if made without authority of law, the vessel

and cargo were not protected, but were subject to seizure and detention.

It was therefore necessary, in order to see whether the citizen had the privilege of trading with the enemy in the manner contemplated by this contract, to review the statutory provisions, treasury regulations, and executive orders concerning the purchase of the products of insurrectionary States. This was done, and after careful consideration we held that a purchasing agent, acting on behalf of the United States, had no authority to negotiate with any one in relation to the purchase of such products, unless at the time of the negotiation the party either owned or controlled them; that neither was the law nor were the regulations through which it was administered, designed to protect a speculation wherein the products contracted to be sold were to be procured by the contractor within the rebel lines after the contract was made. Besides this, we decided that private citizens were prohibited from trading at all in the insurrectionary districts; that the object of the law, and the regulations made to carry it into effect, was to encourage the insurgents themselves to bring their products to us.

There were other elements of decision, but as they are not applicable to this suit they will not be noticed. It is unnecessary to restate the argument in support of the judgment in Lane's case. At the time the subject received our best thoughts, and reflection has only served to confirm the correctness of the decision.

These claimants occupy exactly the *status* of Lane. Risley, therefore, in his character of treasury agent, had no power to deal with them at all; but if it were otherwise, the contract which he did make was unlawful, for they were not the owners of the tobacco in question, nor did they control it even at the time the contract was made, but purchased it long afterwards within the Confederate lines.

JUDGMENT AFFIRMED.