DRAKE, Oh. J.,
delivered the opinion of tlie court:
The claimant seeks to subject the United States to liability for damages for alleged breach of a contract averred to have been entered into on the 6th of January, 1865, between the claimant, a citizen of Eome, Ga., and one Hanson A. Eisley, supervising special agent of the Treasury Department at Norfolk, .Ya., on the part of the United States.
In that contract it was recited that the claimant then owned between 7,000 and 8,000 bales of cotton — about 800 in Selma, Ala., 1,256 in Mobile, 200 in Eome, 1,800 in and about Savannah, and between 4,000 and 5,000 in and about Augusta — and had understandings and negotiations pending with various parties in the States of Georgia, Alabama, South Carolina, and Florida, and at Memphis and New Orleans, for other large quantities of cotton, which he expected to be able to sell and deliver to said Eisley; and thereupon the claimant agreed to deliver to said Eisley, or to some person acting for him, at Fer-nandina, Pensacola, Port Eoyal, Mobile, Huntsville, Ala., Jackson, Miss., Savannah, Brunswick, Chattanooga, Tenn., and New Orleans, 250,000 bales of cotton on or before the 1st day of January, 1866; and Eisley agreed to receive the said cotton at those localities, and in such quantities, from time to time, as Noble might be ready to deliver, and to forward the same to the city of New York, where it should be sold, from time to time, under the direction of Eisley and one George W. Quin-tard, agent of Noble, and in the manner likely to make the same most productive; and out of the proceeds of the sales there should be first paid all expenses, costs, charges, and Government dues; and of the net proceeds one-fourth should be retained by Eisley for the United States, and three-fourths paid to the claimant or his legal representatives.
There are other provisions in the contract which have no bearing upon the questions which rule this case.
The petition claims $309,795.67 damages for alleged breaches of [the contract by the United States, as follows: 1. By the capture by the military forces of the United States in Savannah of 879 bales of cotton which he had there, and would have delivered to the Government under the contract with Eisley if the same had not been so captured ; and, 2. By the burning, *613 by order of General J. H. Wilson, commanding a portion of the military forces of tbe United States, of 294 bales of cotton at Selma, Ala., and 100 bales at Columbus, Ga., which belonged to the claimant, and would have been delivered to the Government under the contract aforesaid if the same had not been so burned.
The facts established at the trial are, that the claimant had in Savannah, in the early part of the year I860, 802 bales of cotton, which were captured by the military forces of the United States and shipped to New York, and there sold by the agent of the Government, and the proceeds of the sale paid into the Treasury.
“ The claimant,” to use the language of his counsel in his brief, “ only seeks to recover the actual net proceeds of the cotton taken from him in violation of his contract, and converted to the uses of the United States. He claims no damage for loss of supposed profits resulting from the violation of his contract by the United States.”
Of course the first question in the case as thus stated is, whether the supposed contract was lawfully entered into on the part of the Government. This is to be determined by the eighth section of the “Act in addition to the several acts concerning commercial intercourse between loyal and insurrection-ary States,” &c., approved July 2,1864, (13 Stat. L., 375,) and the regulations adopted thereunder by the Secretary of the Treasury, with the approval of the President.
The material parts of that section are as follows:
“ That it shall be lawful for the Secretary of the Treasury, with the approval of the President, to authorize agents to purchase for the United States any products of States declared in insurrection, at such places therein as shall be designated by him, at such prices as shall be agreed on with the seller, not exceeding the market-value thereof at the place of delivery, nor exceeding three-fourths of the market-value thereof in the city of New York at the latest quotations known to the agent purchasing. * * * All property so purchased shall be forwarded for sale at such place or places as shall be designated by the Secretary of the Treasury, and the moneys arising therefrom, after payment of the purchase-money and the other expenses connected therewith, shall be paid into the Treasury of the United States.” * * * *
*614 On the 24th of September, 1864, the Secretary of the Treasury, with the approval of the President, adopted and promulgated “ General regulations for the purchase of products of the insurrectionary States on Government account,” among which were the following:
I. “Agents shall be appointed by the Secretary of the Treasury, with the approval of the President, to purchase for the United States, under special instructions from the Secretary of the Treasury, products of States declared to be in insurrection, at places therein designated, or that may, from time to time, be designated as markets or places of purchase.
II. “The following places are hereby designated as such markets or places of purchase, to wit: New Orleans, Memphis, Nashville, Norfolk, Beaufort, N. 0., Port Boyal, and Pensacola.

******

IV. “ The price to be paid for any of the products so to be purchased shall be agreed upon between the seller and the purchasing-agent, but shall in no case exceed the market-value thereof at the time and place of purchase, nor exceed three-fourths the market-value thereof, in the city of New York, according to the latest quotations known to the agent purchasing at the date of the delivery of the products, less a sum equal to the internal-revenue tax and the permit-fee prescribed in the regulations concerning commercial intercourse, dated July 29, 1864, and also subject to such other deductions to cover transportation, insurance, and other expenses, and to such arrangements for payment as may be prescribed in special instructions to the several purchasing-agents.
* * * * * #
VI. “ Proper instructions shall be given whereby daily quotations and prices-current in New York shall be forwarded to the several agents, and to the collector or surveyor (as the case may be) of customs at the several markets or places of purchase, by mail, every day, or as often as there shall be mail communication with such agents or collectors or surveyors.
VII. “The purchasing-agent shall, to the extent of the funds at his command, and in pursuance of his instructions from the Secretary of the Treasury as to price and terms of payment, purchase all products offered to him of the character or description which by such instructions he is authorized to *615 ’purchase; but no liability of any character shall be authorized ■or assumed by any agent for or on account of Government previous to the actual delivery of the products, other than a stipulation, in the form hereinafter prescribed, to purchase products owned or controlled by applicants, at a price to be agreed upon at the place and date of delivery.
VIII. “Whenever any person shall make application to the purchasing-agent in writing, setting forth that he owns or controls products, stating the kind, quantity, and location thereof, or the date at which they will be delivered at some specified location accessible to transportation, the purchasing-agent, if authorized by special instructions to purchase such products, shall give a certificate that such application has been made, and request safe-conduct for such party with the necessary transportation to the locations specified, and for himself and products in transitu from the points named to such purchasing-agent.
# * & # # #
X. “All bills or invoices of purchase shall be made in triplicate after the products purchased shall have been actually delivered to the purchasing-agent, their weight, quantity, and rating ascertained and determined by sworn weighers, meas-urers, or experts; and such bills or invoices shall be certified thereon as to their correctness by such sworn weigher, meas-urer, or expert, and the whole, as to prices and other stipulation expressed therein, certified by the purchasing-agent, together with the date of the latest New York quotations known to the agent at the time of the purchase.
“ The products, with such triplicate bills or invoices, shall then be delivered to the collector or surveyor of customs at the place of delivery, who, on satisfying himself of their correctness, and that the products correspond with the statement set forth in the bills or invoices, shall indorse thereon, over his own signature, a certificate of the facts, which certificate shall authorize payment of the bills to be made by such depositary or other disbursing-agent at such time and in such manner as shall have been agreed upon in writing between the purchasing-agent and seller, taking care to authorize payment at a date sufficiently remote to be certain the proceeds therefrom may be realized, and such bills, duly receipted, shall be paid by the depositary or disbursing-agent named in the *616 certificate as therein stipulated. One of the triplicates so paid shall be immediately transmitted to the Secretary of the Treasury by the disbursing-officer and retained by him, and the other transmitted to the First Auditor with his monthly accounts for settlement.”
Other regulations besides these were issued by the Secretary of the Treasury under date of September 24,1864, but it is not necessary to quote them here. Some of them will be referred to in the course of this opinion. The very great care taken by the Secretary in putting into operation the plan of purchasing the products of the insurrectionary States is abundantly manifest, as well in the regulations above set forth as in the whole body of “general regulations,” of which they form a part. He seems to have been impressed with the danger of fraud in the practical operation of the plan, and to have addressed himself earnestly to the work of guarding against and preventing it. It would be difficult to find a more careful definition of the powers of agents or a more minute and intelligible prescription of modes of proceeding than these regulations furnish. We have, therefore, no very great difficulty in reaching satisfactory conclusions as to the law of the case.
As before remarked, the first question is whether, under the act and regulations presented, Eisley was authorized to make the contract sued on. Of course, when the claimant entered into the contract it was his business to know that the officer with whom he contracted was duly empowered to bind the Government as this contract purports to bind it. If he was not so empowered, no liability of the Government can be based upon his action. We have looked carefully into the matter, and are of opinion that Eisley had no such power.
The act of July 2,1864, in and of itself conferred no authority on any agent appointed in pursuance thereof, but empowered the Secretary of the Treasury, with the approval of the President, to authorize agents to purchase for the United States products of the States declared in insurrection. We turn, then, from the act to the regulations for the terms of the authority of Eisley in this matter; and we consider the following to be an accurate summary thereof.
1. Purchasing-agents were.to purchase, not according to their own judgment as to the products to be purchased, but *617 tinder and according to special instructions from the Secretary of the Treasury.
2. They were to purchase only at the places named, to wit: New Orleans, Memphis, Nashville, Norfolk, Beaufort, N. (!., Port Boyal, and Pensacola.
3. Such an agent was to purchase only to the extent of the-funds at his command.
4. H to purchase in pursuance of instructions from the Secretary of the Treasury as to prices and terms of payment.
5. He was to purchase only such products as should be offered to him by a person making application in writing to sell the same.
6. The person was to set forth in his application that he owned or controlled the products; and state their kind, quantity, and location, or the date at which they would be delivered at some specified location accessible to transportation.
7. The agent was to give a certificate that such an application had been made, and request safe-conduct for such party, with the necessary transportation to the locations specified, and for himself and products, in transitu from the points named to such purchasing-agent.
8. The price to be paid for products should be agreed upon between the agent and the seller at the date and place of delivery, but should not exceed the market-value thereof at the place of delivery, nor exceed three-fourths of the market-value thereof in the city of New York, according to the latest quotations known to the agent purchasing at the date of the delivery of the products, less internal-revenue tax, permit-fee, and expenses.
Such are the main features of the general regulations under which purchasing-agents were to act. And .that the forms of proceeding might be uniform throughout the country, there was appended to the regulations a blank form, to be used by agents, as follows:
“I, A-B-, agent for the purchase of products of insurrectionary States, on behalf of the Government of the United States, at-, do hereby certify that I have agreed to purchase from 0- D-, of-,-, which products it is represented are, or will be, at -, in the county of-, in the State of-, on the-day of -, 186-, and which he stipulates shall be delivered to me, *618 unless prevented from so doing by the authority of the United States.
“I therefore request safe-conduct for the said GJD-, and his means of transportation, and said products, from-to-,where the products so transported are to be sold and delivered to me, under the stipulation referred to above, and pursuant to regulations prescribed by the Secretary of the Treasury.”
Such being the scope and character of Eisley’s authority, •obligations, and duties, as purchasing-agent, we are clear in holding the following views:
1. He had no power to authorize the bringing in of products for sale to any place but that where he was assigned to do duty as such agent, viz, Norfolk, Ya.
2. He had no power to authorize any one to act for him in receiving products at any of the places named in the regulations, except Norfolk.
3. When the supposed contract was entered into, sales of the products purchased were, by Article XII of the regulations, authorized to be made only at Memphis and New Orleans, and Eisley, therefore, had no authority to stipulate for the sale at New York of the cotton which the claimant should deliver.
4. Article XIII of the regulations required products to be sold by or under the direction or supervision of the purchasing-agent, or an agent specially authorized by the Secretary; but the contract stipulated for sales under the joint direction of Eisley and one Quintard, agent of the claimant. Eisley had no authority to make such a stipulation.
5. Article XII of the regulations required sales to be at public auction to the highest bidder, after due notice; but the contract called for them to be made “ in the manner likely to make the same most productive,” which would seem to authorize either a public or private sale, with public notice or without. Eisley had no power to make such a stipulation.
6. The regulations required the price of the products to be agreed upon at the place and date of delivery j but this contract has no such provision, nor, in fact, any provision in relation to the price, but stipulates for the payment of three-fourths of the net proceeds of sales to the claimant.
7. The regulations impose two limitations upon the price to be paid: (1) to an amount not exceeding the market-value *619 thereof at the time and place of purchase; and (2) to an amount not exceeding three-fourths of the market-value thereof in the city of New York, according to the latest quotations known to the agent at the date of the delivery of the products, less certain deductions. The contract has nothing on these points.
8. Article YIII of the regulations confined the agent’s purchases to cases where a “ person shall make application to him, in writing, setting forth that he owns or controls products, stating the kind, quantity, or location thereof.” No such application appears to have been made by the claimant, though the contract recites that he then owned between 7,000 and 8,000 bales of cotton, scattered in five different places; and had understandings and negotiations pending with various parties in the States of Georgia, Alabama, South Carolina, and Florida, and at Memphis and New Orleans, for other large quantities of cotton, which he expected to be able to self and deliver to Eisley, as provided afterward in the contract; and thereupon he agrees to deliver to Eisley, and Eisley agrees to receive, at twelve different places in the Southern States, 250,000 bales of cotton, on or before the 1st day of January, 1866. Of that vast quantity the evidence shows that he owned only 802 bales, and did not, at the date of the contract, control another one. As Eisley could issue the certificate prescribed in Article YIII for no other cotton than such as the claimant owned or controlled at the time of his application, his contract for 250,000 bales was just 249,198 bales beyond his legal authority in the premises.
9. Finally, Article YII of the regulations expressly provides, that11 no liability of any character shall be authorized or assumed by any agent for or on account of Government previous to the actual delivery of the products, other than a stipulation, in the form hereinafter prescribed, [the same above set forth,] to purchase products oivned or controlled by applicants, at a price to be agreed upon at the place and date of delivery.”
This provision limits the purchasing-agent to the prescribed form of “ certificate” appended to the regulations, and is in effect a prohibition against his executing any other stipulation than that on the part of the United States, and stamps this whole contract with flagrant illegality.
In thus setting forth in detail the points in which Eisley, in this contract, exceeded his powers or failed to obey the regu *620 lations, we have not overlooked the bearing- upon this case of the rulings of the Supreme Court in United States v. Lane, (8 Wall., 185,) and Maddox v. United States, (15 Wall., 58;) but as at the argument an effort was earnestly made to distinguish this case from those, because this claimant’s domicile was in a rebel State, we deemed it proper to cover the whole' ground and set forth the particulars in which Eisley’s action was contrary to the regulations under which he was proceeding. When he so acted, it mattered not whether the party with whom he contracted was a resident of a loyal or an insurrec-tionary State. The question was not as to the residence of the claimant, but as to Eisley’s powers as a purchasing-agent. He was a special agent, acting under strictly-defined authority, and every step he took beyond the limits of that authority was an unlawful one, without regard to the status or domicile of the person with whom he contracted.
The necessary and inevitable result of the conclusions we have éxpressed is, that in no way whatever can the Government be held liable under the contract of Eisley. But, aside from those conclusions, there is another point which is completely fatal to this case.
The claimant’s demand is for the net proceeds of the cotton which he owned, and which was seized in Savannah by the military forces of the United States. He claims that the contract created on the part of the United States an obligation to protect that cotton from seizure, because it was to have been delivered to Eisley under the contract.
In considering this, we will waive all objections to the legal validity of the contract, and assume it to have been lawfully entered into and binding upon the United States; and how stands the case in that view ?
Simultaneously with the execution of the contract, and to secure the claimant safe conduct through the Union line's, Eisley signed and delivered to him the following certificate, set forth in the petition:
“January 6th, 1865.
“ I, Hanson A. Eisley, agent for the purchase of the products of insurrectionary States, on behalf of the Government of the United States, at Norfolk, Ya., do hereby certify that I have agreed to purchase from Samuel Noble, of Eome, Georgia, two *621 hundred and fifty thousaud bales of cotton, (250,000 bales,) situated at various points in the States of Georgia, Alabama, South Carolina, Florida, Tennessee, and Louisiana, as more fully set forth in a contract made by me with said Noble, bearing date of January 6th, 1805, which products it is represented are, or will be, at points on or within the lines of national military occupation in the States aforesaid on or before the first day of January, 1866, and which he stipulates shall be delivered to me, unless he is prevented from so doing by the authority of the United States.
“ I therefore request safe conduct for the saidNoble, his agents, and his means of transportation, and said products, from any point on or within said lines, in the States aforesaid, without violating the blockade, to New York, where the products so transported are to be sold and delivered to me under the stipulation referred to above, and pursuant to regulations prescribed by the Secretary of the Treasury.
“ H. A. EISLEY,

U8upt. Spec. Agí. Tr. Dept, authorized, to purchase products

Upon this certificate the President made' the following in-dorsement, which is set forth in the petition:
“Executive MaNSion,
“January 6th, 1865.
“An authorized agent of the Treasury Department having, with the approval of the Secretary of the Treasury, contracted for the cotton above mentioned, and the party having agreed to sell and deliver the same to such agent, it is ordered that the cotton moving in compliance with and for the fulfillment of said contract, and being transported to said agent, or under his direction, shall be free from seizure and detention by any officer of the Government, and commandants of military departments, districts, posts, and detachments, naval stations, flotillas, gunboats, and fleets, will observe this order and give the said Noble, his agents, transports, and means of transportation, free and unobstructed passage for the purpose of getting said cotton, or any part of it, through the lines, other than blockade lines, and safe conduct within our lines, while the same is moving in compliance with regulations of the Secretary of the Treasury, and for fulfillment of said contract with the agent of the Government.
“ABEAHAM LINCOLN.”
*622 Giving to this presidential order the fullest possible authority and scope, it applies only to “cotton moving in compliance with and for the fulfillment of said contract, and being transported to said agent or under his direction,” and declares that cotton so moving and being transported “ shall be free from seizure and detention by any officer of the Government,” and commands military and naval commandants to give the claimant, his agents, transports, &c., “ free and unobstructed passage for the purpose of getting said cotton, or any part of it, through the lines,” &c., “ while the same is moving in compliance with regulations of the Secretary of the Treasury, and for fulfillment, of said contract with the agent of the Government.”
It needs no more than the perusal of those words to see that the President gave no order to the military forces to abstain from capturing cotton which they might find in Savannah or elsewhere, and which was not “ moving ” or “ being transported” for the purpose therein expressed. And there was a very sufficient reason for the President’s refraining from interfering with the right of military capture of cotton, so found, in the fact that Article XY of the General Eegulations, in the following terms, expressly excepted “ captured and abandoned property ” from going into the hands of purchasing-agents:
“All products of insurrectionary States which the purchasing-agent is authorized by his instructions to purchase, moving with or without a permit, shall, on arrival at a place where there is a purchasing-agent, be sold and delivered to him, except captured and abandoned property,n &c.
Here is clearly manifested the purpose to keep “ captured and abandoned property” in the status assigned to it by the act of March 12,1863, and not to allow it to be mixed up with products purchased under the authority of the 'act of July 2, 1864. In other words, the right of capture was not to be interfered with while the property was in store, and not “ moving ” or “ being transported” for delivery to a purchasing-agent under the latter act. And it is equally clear that he who contracted with a purchasing-agent for the delivery of products to him took all the risk of the capture of the products while they were not so “ moving” or “being transported; ” for Risley’s certificate accompanying this contract expressly states that the claimant-stipulated to deliver the cotton to him “ unless prevented front so doing by the authority of the United States.” This was not *623 only a recognition by the claimant of the possibility that the cotton might be captured, but an agreement that such capture should absolve him from the obligation to deliver it, and the United States from the obligation to treat the property as purchased; in other words, should end the contract.
In whatever view the case can be regarded, we are unable to discover any foundation in law for it. The claimant seems to-have mistaken both his rights and his remedy. As stated, his contract was, by its own terms, liable to be terminated by the capture of the property before it was in transitu to Eisley, and, in point of fact, it was so terminated. He was then without recourse against the Government, except in such manner as the Government should, by law, authorize. Such recourse was provided in the act of March 12,1863, which authorized him, at any time within two years after the suppression of the rebellion, to prefer his claim in this court for the proceeds of his property. He failed to avail himself of that right within the two years, and we are therefore without jurisdiction to afford him relief.
The judgment of the court is that the claimant’s petition be dismissed.