Richardson, J.,
delivered the opinion of the court:
This action was commenced by petition filed August 17,1867, under the Abandoned or captured property Act, March 12, 1863, (12 Stat. L., 820,) to recover the proceeds of 3,405 bales of cotton, alleged to have' belonged to Samuel P. Walker, the claimants’ testator, when they were seized by an agent of the Treasury Department in Alabama and Mississippi, in 1865, sent to Eew York, sold, and the proceeds covered into the United States Treasury. On the 20th of November, 1876, an amended petition was filed, joining the administrator of Robertson Topp as a party with the executors of the original claimant, Samuel P. Walker, who had died, and setting forth the cause of action in a different form and more in detail. To this latter petition the defendants have filed a plea of the statute of limitations. As to Topp’s administrator the plea becomes immaterial, since the facts found do not show that Topp ever had any interest in the case, and the claimants’ attorney will have leave to strike out his name and claim from the petition, as suggested *419 at the trial might be done in case his interest should not be proved. Walker’s executors are properly admitted as parties.As to the cause of action set forth in the amended petition^ and the allegations therein in support of the same, the claimants’ counsel present them as in the nature of a new count added to the original declaration, or as a bill of particulars more fully specifying the case, and not as introducing a new cause of action. They rest their whole case upon the Abandoned or captured property Act. We so treat the pleadings, and have incorporated into the findings no fact not material under the original petition, and therefore we overrule the plea of limitations.
Of the 3,405 bales claimed as the property of said Walker, 1,922§ bales were, by agents of the Treasury Department appointed to collect cotton belonging to Confederate States within insurrectionary territory, seized as such Confederate cotton between the 30th of June and the 1st of December, 1865, upon the plantations where the same had been raised, in the counties of Roxubee and Monroe, and in other counties in Mississippi, and were sent to Hew York, sold, and the proceeds covered into the Treasury. As the cotton was seized after the 30th of June, 1665, jurisdiction of the claim would have been transferred to the Secretary of the Treasury by the Act May 18, 1872, (17 Stat. L., 134, § 5, chap. 172,) but for the proviso therein excepting claims in cases then pending in this court.
The main point in controversy upon the findings is as to the ownership of the cotton by said Walker, the validity of his title by purchase, or his right to the same as against the United States, and this requires the determination of several important questions of law.
Walker was a citizen and resident of Memphis, Tenn., which was in the military occupation of the forces of the United States, while the whole State was declared to be in insurrection by the President’s proclamations, and so continued to the close of the war. (12 Stat. L., 1262; 13 id., 730.)
On the 6th of March, 1865, the President gave to Walker a written paper, of which the following is a copy:
“ Executive Mansion,
“ March 6th, 1865.
“ Whereas Samuel P. Walker, of Memphis, Tenn., claims to own products of the insurrectionary States near Drenada and *420 Canton, Miss., and Montgomery and Selma, Alabama, and lias arrangements with parties in the same vicinities for other products of the insurrectionary States, all which he proposes to sell and deliver to agents authorized to purchase for the United States the products of the insurrectionary States, under the act of Congress of July 2d, 1864, and the regulations of the Secretary of the Treasury, it is ordered that all such products which a purchasing-agent of the Government has agreed to purchase, and the said Walker has stipulated to deliver, as shown by the certificate of the purchasing-agent, authorized by Regulations VIII, Form Ho. 1, appended to regulations, attached hereto by such agent, and being transported or in store awaiting transportation for fulfillment of stipulations and in pursuance of the regulations of the Secretary of the Treasury, shall be free from seizure, detention, or forfeiture to the United States ; and officers of the Army and Uavy, and civil officers of the Government, will observe this order, and will give the said Walker, his agents, and means of transportation, and said products, free and unmolested passage through the lines, (other than blockade lines,) and safe-conduct within the lines, while going for or returning with said products, or while said products are in store awaiting transportation for the purposes aforesaid.
(Signed) “ABRAHAM LIHCOLN.”
On the 12th of April, 1866, the day on which Mobile surrendered to the Federal arms, Walker was there and purchased of one O’Grady the 3,406 bales of cotton mentioned in the petition, and took a bill of sale of the same, and received from O’Grady, with his indorsement thereon, thirty-seven bills of sale, commonly called “ planters’ certificates,” given originally to said O’Grady’s vendors, and duly transferred to him. The cotton was first purchased by the Confederate States government of the different planters by whom it was raised, and whose bills of sale or certificates therefor, to the number of thirty-seven, were given to the confederate agent, in each of which the planter acknowledged payment in bonds for the cotton sold b,y him, certified that the same was on his plantation, and agreed “ to take care of said cotton while on his plantation' and to deliver the same at his own expense [at a place named] in the S'ate of Mississippi, to the order of the Secretary of *421 the Treasury or his agent or their assigns.” The cotton was all on plantations within the rebel lines, and was never delivered otherwise than by the certificates and transfers thereof as before stated, and was never in the actual possession of Walker or either of the previous owners, except the planters, who still had the custody of the same up to the time of seizure.
Subsequently, on June 1, 1865, Walker made a contract with E. W. Kellogg, agent of the United States for the purchase of cotton in the insurrectionary States on Government account, to sell to him said 3,405 and other bales of cotton by an agreement of which, the following is a copy:
“Mobile, Alabama, June 1st, 1865.
“ I, Francis W. Kellogg, agent for the purchase of cotton of insurrectionary States, on behalf of the Government of the United States, at Mobile, Alabama, do hereby certify that I have agreed to purchase from Samuel P. Walker, of Memphis, Tennessee, twelve thousand (12,000) bales of cotton, which, it is represented, are or will be stored at Selma, & on the Warrior River, Ala., and with different planters in the counties of Monroe, Lowndes, & Noxubee, in the State of Mississippi, and which he stipulates shall be delivered to me, unless prevented from so doing by the authority of the United States.
“ I therefore request safe-conduct for the said S. P. Walker and his means of transportation and said cotton, from where it is stored to Mobile, where the cotton so transported is to be sold and delivered to me, under the stipulation referred to above, and pursuant to regulations prescribed by the Secretary of the Treasury.
“ P. W. KELLOGG,
“ United Stañs Purchasing-Agent.
“ Notice. — Cotton arriving at Mobile under this permit must be promptly reported to the United States purchasing-agent.”
It is maintained on the part of the claimants that the writing given by the President to Walker, on the 6th of March, was a permit or license for him to purchase within hostile territory, from the citizens thereof, the products of insurrectionary States, and so far removed the restrictions of the non-intercourse acts as to him and his purchases. We do not so regard it.
The Act July 13,1861, (12 Stat. L., 257, § 5, chap. 3,) authorized *422 tlie President by proclamation to declare tlie inhabitants of any State, or any section or part thereof, to be in insurrection against the United States, and provided that “ thereupon all commercial intercourse by and between the. same and the citizens thereof and the citizens of the rest of the United States shall cease and be unlawful so long as such condition of hostility shall continue.” The same section also provided “ that the President may, in his discretion, license and permit commercial intercourse with any such part.of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed-by the Secretary of the Treasurjr;” and power was given to the Secretary to appoint officers to carry into effect such licenses. Proclamations declaring what States and parts of States were in insurrection, and the prohibition of commercial intercourse therewith, were issued August 16,1861; May 12, 1862; and April 2, 1863. (12 Stat. L., 1262, 1263; 13 id., 730.) The Secretary of the Treasury made rules and regulations for conducting and carrying on the limited commercial intercourse which the President should license, and the President made and issued executive orders February 28, 1802, and March 31, 1863, giving notice of what intercourse he permitted and licensed. Por copies of orders see Hamilton v. Dillon, (21 Wall., 76, 77.*)
On the 2d of July, 1864, by act of that date, (13 Stat. L., 377, § 9, chap. 225,) it was enacted “ that so much of section 5 of the act of July 13, 1861, aforesaid, as authorizes the President, in his discretion, to license or permit commercial relations in any State or section, the inhabitants of which are declared in a state of insurrection, is hereby repealed, except so far as may be necessary to authorize supplying the necessities of loyal persons residing in insurrectionary States, within the lines of actual occupation by the military forces of the United States, as indicated by published order of the com manding general of the department or district so occupied, and also excepting so far as may be necessary to authorize persons residing within such lines to bring or send to market in the loyal States any pro *423 ducts which they shall have produced with their own labor, or the labor of freedmen or others employed and paid by them, pursuant to rules relating thereto which may be established under proper authority.” And by section 8 of the same act provisions were made for a new kind of commercial intercourse with the people in insurrection, by which agents were to be appointed by the Secretary of the Treasury, with the approval of the President, to purchase for the United States any products of the in-surrectionary territory, subject to the restrictions therein expressed.
Thus it will be seen that on the 2d of July, 1864, the President’s power to authorize commercial intercourse, and grant permits and license to trade with the insurgents, which had been conferred upon him by Congress, was taken away by statute, andlie had no right thereafter to issue a license to trade to anybody, with the limited exceptions mentioned in the section cited and not material in this case, (6 C. Cls. R., 420,) unless that right belonged to him as commander-in-chief of the Army and the supreme head of executive power.
In England, that right is unquestionably conceded to the sovereign, who, having the power to declare war and peace, may remove, in whole or in part, that incident of war by which the subjects are prohibited from having commercial intercourse with the inhabitants of hostile territory. (1 Ch. Robinson’s Admiralty R., 197.) But by the Constitution of the United States (Const., art. 1, sec. 8) Congress alone can declare war, and any right which is merely incident to that power, and which rests thereon exclusively for authority, would seem not to exist in the President without the consent or against the will of Congress. Nor would it seem to be possessed by the President as Commander-in-Chief of the Army and Navy, except so far as it might be necessary for the maintenance, movement, and supply of the forces under his control, and the military operations by him conducted, since, beyond that, great questions of commercial and political public policy would be involved, more appropriate for determination by Congress than by the Executive.
But it is not necessary to rest this case upon the power or want of power in the President to grant permits or license to trade with the subjects of the enemy, or within hostile territory, because, in our opinion, the writtén paper relied upon by the claimants, given to Walker on the 6th of March, was not a *424 license or permit to trade •, and it is not so expressed and -was not so intended. It begins by reciting that Walker claimed to own products in the insurrectionary States, and had arrangements with parties therein for other such products, and that he proposed to sell the same to agents of the United States authorized to purchase such products for the Government, and then it proceeds to set forth what the President does grant thereby. He orders that all such products which a purchasing-agent has agreed to purchase shall be free from seizure, detention, and forfeiture, and all officers of the Army and Navy, and all civil officers of the Government, are directed to observe this order and give said Walker, his agents, and means of transportation, and said products, free and unmolested passage through the lines, and safe-conduct within the lines, while going for or returning with said products, and while said products are in store awaiting transportation. There are no words of license to trade in the document. It is a mere pass or order, cautiously limited to matters connected with the products which were owned or controlled by Walker, and granted to him nothing but for himself and his products “safe-conduct, unmolested passage, and freedom from seizure, detention, and forfeiture.” It was issued and is drawn up in language strictly with reference to the purchasing of products of insurrectionary States by the agents of the United States, and in aid of that object, and it conferred no authority or benefit which Walker did not have without it under the Act July 2, 1864, (13 Stat. L., 377, .§ 8,) and the regulations of trade made by the Secretary of the Treasury, except as an order and passport from the commander-in-chief, granting to him “free and unmolested passage through the lines and safe-conduct within the liues while going for and returning with said products,” and exemption from seizure of himself and his products.
It does not purport to give Walker a general license to purchase products, and cannot be so construed, even if the President had the power to confer such a privilege upon him. And when the language is read in the light of the important fact that Congress had taken away from the President by statute the power previously conferred upon him of granting licenses to carry on commercial intercourse, it seems conclusive that this document was not intended to and did not authorize commercial intercourse except as provided by the statutes, and that it *425 only recognized Walker’s right to sell to the United States agents the products which he owned, or might control, and assured him protection and safe conduct for the same and for himself. As a passport and order for protection it was within the clear and unquestionable power of the commander-in-chief to grant, and was of great importance and might become of great value to Walker, who was an enemy residing in hostile territory occupied by the Union forces, claiming to own and control property within the lines of the enemy. To such a person, so situated, the order allowing him “free and unmolested passage through the lines, and safe conduct within the lines,” and protection for himself and his products, conferred upon him an exceptional privilege which sufficiently indicates the object and scope of the document, and renders it unnecessary to give to it any further effect in order to carry out the will of the President thus distinctly expressed, and to that extent exercised, within his legal and constitutional authority.
If then the claimants’ testator was not licensed by the order of the President to make the purchase which they rely upon to prove his title to the cotton, it is necessary to determine whether or not he was prohibited by the non-intercourse acts from thus acquiring title to such property so situated as against the United States.
As has been seen, the act of 1861 (12 Stat. L.,-257) prohibited all commercial intercourse between citizens of States and parts of States declared in insurrection by the President’s proclamation and the citizens of the rest of the United States. In July, 1861, the President issued his proclamation (12 Stat. L., 1262) declaring in insurrection the inhabitants of the States of Tennessee, Alabama, Mississippi, and other States, excepting such parts as “may, from time to time, be occupied and controlled by forces of the United States engaged in the dispersion of said insurgents.” By proclamation of April 2,1863, (13 Stat. L., 731,) the President revoked that exception, saving only the ports of Hew Orleans, Key West, Port Royal, and Beaufort, and some counties of Virginia. This left the parts of insurrectionary States occupied and controlled by the Federal forces declared to be in rebellion as the rest of the States to which they belonged. Then followed the act of 1864, (13 Stat. L., 376, chap. 225,) where by section 4 it was enacted as follows: “The prohibition and provisions of the act approved July 13,1861, and of the acts *426 amendatory or supplementary thereto, shall apply to all commercial intercourse by and between persons residing or being within districts within the present or future line of national military occupation in the States or parts of States declared in. insurrection, whether with each other or with persons residing or being within districts declared in insurrection within those lines.”
It has been decided by the Supreme Court that a citizen of that part of an insurrectionary State held and controlled by the military forces of the United States could have commercial intercourse neither with the citizens of the loyal States, (Outner's Case, 17 Wall., 517,*) nor with the citizens of disloyal States, outside of the territory so occupied. (Ensley’s Case, 9 C. Cls. R., 12.) The facts now before us present the case of a citizen of one place, occupied by the Union forces within an insurrection-ary State, having commercial intercourse with a citizen of another pl£\ce, held in like manner within another insurrection-ary State, the two places being separated by intervening territory and under the command of different military officers, General Canby at Mobile, and General Thomas at Memphis, and the property purchased being mostly in still another insurrec-tionary State and all within the rebel lines.
At the time of his purchases Walker was a citizen of Memphis, which had been occupied by the Federal forces since June 6, 1862, within the State of Tennessee, which was declared to be in rebellion. O’Grady was a citizen and resident of Mobile, Ala., which was similarly situated. On the very day that Mobile surrendered to the national arms Walker appeared in that place, and concluded his purchase from O’Grady of the large quantity of 3,405 bales of cotton on plantations in Alabama and Mississippi. The purchase and sale of property between such persons, so situated, and under such circumstances, would seem to be clearly prohibited by the Act July 13, 1861, (12 Stat. L., 257, § 5,) as amended and affected by the Act July 2,1864, (13 Stat. L., 376, 377, §§ 4-9,) and so rendered void' thereby as against the United States, according to the decisions of this court and of the Supreme Court heretofore rendered. Walker, being a •citizen of Memphis, could gain no rights of general commercial intercourse with the citizens of Mobile by going there with the Army when that city surrendered, or by remaining if he were there before the surrender. His rights depended upon the *427 place of his domicile. (Desmare's Case, 10 C. Cls. R., 385; 93 U. S. R., 605.) *
It appears to have been the policy of the law to shut out from general commercial intercourse with everybody the inhabitants of sections of insurrectionary territory occupied by the United States armies in the field; and the citizens of the different isolated sections so held did not, on account of being similarly situated, have a right to pass over intervening territory and trade with each other in places and States in which they did not reside. If they had possessed such right, they would have been privileged above all other citizens of both loyal and disloyal territory. The prohibition of commercial intercourse by •citizens of the occupied places applied to trade “ whether with •each other or with persons residing or being within districts declared in insurrection within those lines.”
The circumstances under which Walker made his purchase do not aid in rendering valid his title. It was consummated ou the very day Mobile fell into Federal power; when the hostile armies were exhausted and severely pressed on all sides; when the confederacy as an armed power was crumbling in pieces, and the territory within which the cotton was stored was about to be surrendered, and in less than a month, on the 5th of May, 1885, was surrendered to the Union Army. The transaction was purely a speculative one, not authorized nor encouraged even under the statute and regulations for the purchase of the products of insurrectionary States by the Rational Government through its authorized agents.
The claimants’ case is not altered by the fact that on the 1st of June, 1865, he entered into a written agreement with a Treasury agent to sell the cotton to the United States. If his title was not valid against the "United States the act of the piir-chasing-agent would not bind the Government to pay for what it had a better title to itself. He had no authority to waive any rights of the United States, and the proceedings authorized for the purpose of obtaining from the producers themselves the products of insurrectionary territory could not be used to cover a defective title, or aid a speculative transaction, or deprive the United States of their legal rights of conquest.
It has been said by the Supreme Court, “ Neither was the law *428 nor were the regulations through which it was administered designed to protect a speculation wherein the products contracted to be sold were to be procured by contractors within the rebel lines after the contract was made. Besides this, we decided that private citizens were prohibited from trading at all in the insurrectionary districts; that the object of the law and the regulations made to carry it into effect was to encourage the insurgents themselves to bring their products to us.” (Maddox v. United States, 15 Wall., 62;* United States v. Lane, 8 id., 185.†)
It would be a clear evasion of the law to allow cotton purchased as this was by Walker to be sold to the United States through an agent appointed to encourage the insurgents themselves to bring in their own products for sale to the United States.
If we go behind the claimant Walker’s purchase, we shall find the title of his vendor also tainted with a fatal defect, of which Walker had notice, and subject to which he bought the cotton. O’Grady, who sold to Walker, purchased directly of the Confederate States, through an agent of that de facto government, who was authorized and directed to make sale of this and other cotton to raise money for the pressing needs of the armies in the field and to meet its other obligations, and who received payment at a dollar a pound in Confederate notes.. And this purchase was made at Mobile only five days before the rebels evacuated that city, and six days before it surrendered to the Union forces. The cotton was sold to aid the rebellion, by supplying the government with means to continue resistance to the national armies.
By the decision in Sprott’s Case, such a purchase was void as against the United States. (Sprott v. The United States, 20 Wall., 459.‡) That case and this cannot be distinguished in principle. Sprott was a citizen and resident of Mississippi, within the Confederate lines, and there purchased his cotton of an agent of the Confederate States, and paid for it in the currency of the United States. The only difference between the two cases is, that in Sprott’s case payment was made in United States currency, and in this case it was made in Confederate notes. These notes were of value to the Confederacy at that time, and they con *429 stituted tlie only currency througli which the rebel government conducted its domestic purchases, paid its officers and soldiers, and supported its armies in hostile resistance. To furnish that government with Confederate notes was aiding the rebellion as much as to furnish it with United States currency, the difference being only in the value of the money, and the difference in value was made up for by difference in quantity. In Sprott’s case the cotton sold for 10 cents a pound in United States currency, and in this case for SI a pound in Confederate notes.
If this purchase by O’Grady was void as against the United States, the purchase from him by Walker was equally void, for Walker knew the title of O’Grady, and took the same tainted with.all its illegality and defects. He not only took a bill of sale of the cotton without recourse to O’Grady, but he received from him the37 original planters’ certificates, receipts, and agreements, by which it appeared that the planters sold to the Confederacy and agreed to take care of the cotton and deliver it to the order of the secretary of the rebel treasury, or his agents or their assigns, to each of which the rebel cotton-agent attached a transfer under his hand and official title, with directions to the planters to deliver the cotton to O’Grady or his order, and accompanied by a license to export the same from the Confederate States. And these planters’ certificates, with the rebel agent’s transfer and license to export, were all indorsed by O’Grady and passed over to Walker at the time of purchase by him. They constituted more than notice to him of the illegality of the purchase by O’Grady as against the United States; they were the muniments of his title, and contained his authority to take possession of the cotton and remove it beyond the rebel lines, an authority granted by the Confederate government, and resting upon that power alone for its validity. Without these • certificates and orders and license Walker would have no claim even to the possession of the cotton while the Confederates held control of the territory, and he never did, in fact, obtain possession, because the rebel power was soon afterward forever broken and destroyed, and the officers of the United States, its conquerors, seized the cotton by right of conquest before Walker reached it to assert his title; and if to the Union military officers he had asserted title thereto, through the fallen power and the order of that hostile organization, it would have merited and'rightly received no more respect than is given by the courts *430 of the Union to the contracts and orders of the rebel government, when their execution would be to the injury of the United States.
Walker’s title and right of possession, as against the United States, were trebly defective ; first, in his own purchase in violation of the non-intercourse acts; second, in the illegal purchase by O’Grady from the enemies of the Union in hostile organization, of which he had notice; and, third, in being himself obliged to claim through transfers, orders, and licenses from that hostile organization.
The transactions were throughout, in the language of the Supreme Court, “ tainted with the vice of the rebellion,” and that vice, as against the United States at least, destroys every contract, makes void every purchase, and bars every claim into which.it enters. (Whitfield v. The United States, 92 U. S. R., 170, 171.*)
The judgment of the court is that the petition be dismissed.
LobinGt, J., although absent at the time of entering judgment, was present at the trial of this case, took part in the decision, has read this opinion, and concurs in the conclusions.
Pecic, J., was of the opinion that the claimant should recover.

 And 10 C. Cls. R., 78.

 9 C. Cls. R., 4.

 Ante, p. 26.

 C. Cls., R. 70.

 7 id., 97.

 10 id., 1.

 11 C. Cls., R. 444.